36066.   ROSENBAUM *v.* RIVERSIDE MILITARY ACADEMY, INC.

Decided March 13, 1956—Rehearing denied March 28, 1956.

*Frank B. Stow, Robert E. Andrews,* for plaintiff in error.
*Johnson & Johnson, Hammond Johnson,* contra.

FELTON, C. J.   The defendant contends that the plaintiff's son became enrolled in and admitted to the academy, and that under the terms of the school catalog the plaintiff was not entitled to a refund of the tuition paid.   The specific provisions of the catalog relied on by the defendant is as follows: "It is a condition upon which a Cadet is admitted that he remain in the Academy until the end of the academic year.   As the engagement of teachers and other provisions for the management of the school are contracted for the entire year in advance, it is distinctively understood between the parent and the school that there can be no reduction in the charges of any Cadet leaving for any cause before the close of the year, except in the case of continued sickness of a duration of more than one period of six consecutive weeks, when a refund of $10.00 a week is allowed if claim is made accompanied by a physician's certificate."

The plaintiff contends that his evidence shows that his son was never enrolled in or admitted to the Academy as a student.   The pertinent evidence is as follows: Dr. M. L. Rosenbaum testified for the plaintiff in part: "I live in Meridian, Mississippi, and I am the father of Lewis Rosenbaum.   I was contacted in Meridian, Mississippi, by Lieutenant May of Riverside Military Academy concerning my son as a student in Riverside Military Academy.   He came to Meridian to see me.   I don't know whether that was his sole objective in coming to Meridian but I gathered

after I talked with him, he lived at Poplar Field, Miss., and is a member of the faculty and it seems to be a rule of the Academy men who live in the state make a canvass for prospective students in the state. I don't remember the date that I received a catalog, or whether Lt. May contacted me after I received a catalog. I had written for a catalog and I think he was delegated by the Academy to call on me. Everything that happened was between Lt. May and myself personally at Meridian, he is the only one I ever had any dealing with. I did later see Lt. May in Gainesville, Georgia. . . I came to Gainesville in company with my son. I think we arrived on Saturday morning in Gainesville, the day the new students were to be received. It was on Saturday morning. As to what I did and when I went to the campus at Riverside Military Academy, I went late Saturday morning because I was surprised that no one met us as I requested. They said they would be there about mid-morning. After we had had breakfast I phoned out to the Academy and asked to talk with Lt. May and the lady answering the phone stated he was on duty and couldn't come to the phone and I asked her to please give him a message and tell him that we were at the hotel waiting for him to come take us out to the Academy. During the day I did go to the Academy. As to who I saw out there, well we got out there and saw Lt. May standing on the steps of the administration building and I spoke with him and he told my son for him to get in line—there was a line of boys just inside the door and out there and Lt. May said 'you stay with me and the boy' and the line moved on down. I did hear somebody order him. Lt. May told him to get in that line and he did. I was later conducted around the campus on what they called a tour. We were conducted through the dormitories and dining hall and part of the class room. As to whether I found the campus and installations to be the same as it was represented in the catalog, I was disappointed in the physical plan of the school. I was disappointed in the following particulars: the rooms were very barely furnished and the inside walls weren't finished at all—it seems to me that I think it was tile walls that had no finish ever [sic] what they call the ceiling, not even in boards over it and about the only thing in the rooms was a double decker bunk. At the time we made the tour of the campus I think my son was with

me, I think we went together. After making the tour of the campus, I told Lt. May, 'I'm going to leave it in your charge', or 'Will you please take charge? I am going to town'. I later saw my son that day. The occasion for me seeing my son later that day was, I came to town—after having driven all night to get here I was pretty well used up—and I went to the hotel to rest and went to sleep and I think it was about 2 o'clock in the afternoon the telephone rang and my son or my boy asked me to come get him, said he wanted to leave and go home, he said 'Come and get me, I haven't even opened my trunk, I don't want to unpack my trunk'. I went out to get my boy, he was in quite an agitated state and I told him I would be there as soon as I could get there and I went out and got him. I saw Lt. May on that second trip and my son and I both had a conversation with Lt. May. As to what he told me, I would like to go back a minute if I may, when I went out there, I found my boy, he was in the room, he was the most dejected person I have ever seen in my life. It worried me, his attitude and the way he looked. After I had rejoined my son we went to Lt. May, he invited us to his apartment. We went into his apartment and he invited us to be seated in his living room. We had a conversation with Lt. May there, Lt. May tried to interest the boy in staying and recited instances of other boys who had been there and were dissatisfied and he told him if he could tough it out for three weeks, he felt sure he would be satisfied. Well it looked like the boy was determined to leave, he was so unhappy about the whole thing and Lt. May finally said, 'Well, if you feel like you don't want to stay or can't stay, I would rather lose my commission and you go home with your daddy because if you do stay it's going to cost him a lot of money and if you leave now it will only cost you $25.00 and the matriculation fees.' That terminated the matter after he told me if he left then it would be only the $25.00 matriculation fee. So, we left immediately and I asked Lt. May at the time, I said, 'Should I stop by the office and ask for a return, to get my money back?' and he said, 'You will hear from it and it will be sent to you within two weeks', and so, we brought the boy's trunk downstairs and called a baggage transfer man and had it delivered to the bus station and we went to the hotel. . . My boy did not stay any nights at Riverside Military Academy. He did not eat

any meals at Riverside Military Academy. He did not attend any classes at Riverside Military Academy. He did not attend any drills at Riverside Military Academy. There was a manual code issued to my boy, the price was 35 cents. A piece of paper marked plaintiff's Exhibit No. 1 that you hand me is a slip that was received by me for the code manual at the time it was withdrawn. The only thing that my boy received from the twelve hundred and some odd dollars that I paid to Riverside Military Academy was that 35 cent manual code. My son was never issued a uniform. . . I have never had any transaction with anyone except Lt. May concerning my boy going to Riverside. . . My boy went out to Riverside and got in this line and I don't know what he signed, he did what they told him to do. He was given a room out there and I think his baggage was put in the room. It was in the room, I imagine it was put in there, I don't know who put it up there. I don't know whether he or some other boy did or not. He was told that was the room he was to be in and he was told that he had a roommate. I did meet his roommate. I do not recall his name. I did not meet the other two boys in the same suite with him. I did not meet his suite mates. He was told that his roommate was there. Then I went back and found him in the room. That was the room that had been signed to him, my son. I carried him off with me that afternoon. That was after he had signed what he signed and I suppose after he had been assigned to a room. You see I left the campus, I don't know what they did after I left. He was not already in the room before I left the campus. I found him in the room when I returned to the campus. I met his roommate sometime when I was on the campus that morning, before I left the campus and went to town, Lt. May told me who he was. I don't recall whether I saw him in the room or not. I saw my boy's baggage in the room. It had already been placed in there. That was evidently after he had signed the card. As to what parcel of baggage was in the room, I don't remember just what was in the room. The baggage was transported from Meridian and it reached the Gainesville station by bus just as we came. We checked it through. Some baggage company here in town carried it from the bus station to Riverside. I don't know who it was. Neither me nor my son carried it out. As to who showed them where to put it, I was not present,

I don't know. The baggage was in the same condition when I went back to get my son as it was when we left Meridian, it was never even opened. The rope was still around the trunk. I paid the money to Lt. May at Meridian, Mississippi. Me and my son stayed at Riverside Military Academy several hours at the most. We got there probably between ten and eleven in the morning and I think we left about 2 in the afternoon. I had in mind for my boy to enter Riverside. He did not enter Riverside Military Academy. I took him out there and left him out there. If he seemed contented I intended to go on back to Meridian, Miss., without him. I did not turn him over to the school and make my plans to go back to Meridian. I came back to town. As to what I was going to do then, I went to the hotel and went to sleep. After I took a nap I was going to hear from Lt. May and find out how the boy was getting along and everything looked favorable I was going on back home. I did not have any intention one way or the other of leaving the boy or taking him back home, I wanted to see whether he would become reconciled and so on. I left him out there. I did not say anything to him about going back to town with me. I did not intend to take him back to town if he would stay out there. I turned that check over to Lt. May in person, delivered it in person at Meridian, Miss. Lt. May had the application too and I turned it over to him. It was all consummated in my office. That application was signed there, it was not mailed in by me. At that time Lt. May told me the matriculation fee of $25.00 was all if my boy did not enter the school, that was when I signed the application. As to what he said about the $25.00, that was all that was necessary to be paid with the application. As to what he said would happen if the boy did not enter school, well the balance would be paid in installments. He said if the boy did not enter Riverside I would forfeit $25.00 and that would be all. This representation was made to me by Lt. May. As to why I paid all of the $1200, I asked Lt. May about it and he told me there would be a discount if I would pay it in advance. He had me there and I said 'I might as well pay it all now and get it through with and the boy won't be disturbed during the term'."

Lewis A. Rosenbaum testified for the plaintiff in part: "I am twenty-one years of age and my father is Dr. M. L. Rosenbaum.

I was not ever enrolled as a student at Riverside Military Academy. I have been to Gainesville, Georgia, as I recall, I arrived in Gainesville on the 15th day of September and were there through the 16th and left on the 17th. I went to Gainesville, Georgia, to visit Riverside Military Academy. I arrived on the campus of Riverside, Sunday the 16th of September, 1950. The purpose of my going to Gainesville to visit the campus of Riverside Military Academy was mainly to visit, to see the school and to decide whether or not I would attend school there during the session, during the school year. I know a Lt. May affiliated with that school. I have had an occasion to speak with Lt. May. Lt. May first called on me in the month of August in Meridian, Mississippi, of the same year to talk to me about going to Riverside Academy as a student, for the coming school year. At that time I did not have a conversation with Lt. May concerning my registration as a student at Riverside Military Academy. At that time in Meridian, well he talked to me about registration, gave me a preliminary outline of courses the school offered and gave me some background of the school at that itme. At that time also I had consented to see the school, visit the school. I mean by that, he asked me whether or not I should like to go to school there and then I think my father sent him tuition for the year, but prior to my departure for the school, I wired that I would not go, would not be in attendance at the school. Lt. May called long distance from the school in Gainesville, asking me to come up and see the school. This was in September, of course and not in the month of August. Pursuant to this telephone conversation with Lt. May from Gainesville, I went to Riverside Military Academy to see the school. At the time I went to the Academy I was not sure I was going to attend. There was some uncertainty at the time in my mind as to whether I would attend. As to whether I ever registered as a student at Riverside, I filled out a registration form or a card in the office in which new students were received. Whether or not this card was processed by the school I don't know. I did not ever occupy a room in any of the dormitories at Riverside Military Academy. I did not ever eat a meal in the mess hall or dining room of Riverside Military Academy. I did not ever attend a class, drill or other meeting at Riverside. I was not ever issued a uniform by the school. As to whether

or not I ever received any text books or manuals from Riverside, at the time which I filled out a card in the office, we were given a code manual. It was a manual of rules and regulations of the school and school policy was stated therein. There was a charge for the manual, this charge I think was to be deducted from the amount paid to the school. The green slip of paper that you hand me, marked plaintiff's exhibit No. 1 is a voucher from the bookstore for the code book that I received from the school. I received this code book that I have previously commented upon. I took it back to Meridian after our departure from Gainesville. At the present time I do not know its whereabouts. My father had it in Meridian for some years. I can not say whether it is in his possession or not. I left the campus of Riverside Military Academy on Sunday, September 16, that is the same day that I arrived on the campus. I have not returned since then. I have not ever visited the school since then. As to why I did not stay at the school, on seeing the school, investigating their facilities, I found that it would be much to my advantage to return and continue my studies where I had studied previously, that is in the Meridian High School in Meridian. . . Me and my father and my brothers had a conversation with Lt. May that day concerning my status as to tuition and enrollment. The gist of that conversation as best I can recall, this conversation took place after I had a tour of the campus and saw the facilities offered, and the scene of the conversation on this day was Lt. May's apartment on the campus, and at that time he informed me that, should I decide not to attend school there, that a tuition refund, with the exception of $25.00 matriculation fee and 35 cents I think for the code book, could be paid, provided I was issued no further text books or uniform. This was made in his apartment in the presence of my father and myself. I departed the campus on that same Sunday, September 16, 1950. Lt. May was notified of my departure. We also had contact with Lt. May the following Monday morning before our departure from Gainesville, Georgia. The nature of that contact, it was a formal notification of my departure from school. It was delivered verbally by my father. My father and I were on the campus that day. It was an official visit to inform them that I would not be attending school and after seeing the campus and discussing the matter. To my knowl-

edge there was nothing further said about the tuition at that time. I originally planned to come to Gainesville on Friday night before I did come, but we left Meridian on Friday night as it turned out. I got to Gainesville late Saturday night. We checked in at the hotel and spent the night there. . . I say we went out to Riverside on Sunday morning from the hotel, just me and my father, as I recall that was the procedure. As I recall Lt. May was not with us at the time. When I got to Riverside, I had a conversation with Lt. May on the campus. I was given a tour of the campus, not by Lt. May, but by one of the members of the faculty, a math professor, as I recall, a retired colonel at the time, teaching mathematics. I was later introduced to the band director and shown his facilities. . . Now after the tour of the campus, during the day, we filled out an enrollment card, a registration card, in the office or main hall of the school. I recall there was a line of students to fill out the card. At the same time my father and Lt. May withdrew off to one side for conversation. The card you hand me marked Defendant's Ex. 5 is the card that I filled out or signed. That is my signature and I signed it. I think perhaps the hour mentioned on there is about the time. I did not take any baggage up there to Gainesville with me. My traveling baggage and baggage for school, should I have decided to stay, I did have a trunk with me. The baggage of course, I left a part of it at the hotel. As to the trunk, the trunk was sent to the school. The trunk was marked for the school and sent to the school, delivered directly to the institution. I was assigned a room there in Lt. May's quarters. The trunk was delivered to that room. I saw those quarters. As to whether I had been assigned a roommate at that time, I think the student who was to occupy the room was on campus but I did not meet him at the time. I met the two students on the other side of the suite, occupying the other side of the suite. That was the room my baggage was put in, the room that had been assigned to me. As to the time of the day that I say I left on the 16th, I left the campus on the afternoon of the 16th. We returned to town for a late lunch that day. I did not go back to school after lunch. It was rather late in the day. We didn't go back to the campus that day. As to why I did not eat at Riverside that day, we had a tour of the cafeteria, in fact while we were in the cafeteria, lunch was being

served. But as I say, we had slept late that morning and had eaten a very late breakfast and decided to return to town. That is the reason I did not eat out there at the school. I testified a while ago that at the time I went to Gainesville and to Riverside, my father had already sent in this signed application and the money for my tuition. I got the code book that they signed me 35 cents for. As I recall I was not presented with anything else at the time I signed this signature card. . . The conversation in Lt. May's apartment about the tuition, that took place on Sunday afternoon. I don't recall the time of the afternoon, the exact hour I don't recall. Me and my father and Lt. May were present. Mrs. May was in and out of the room at the time but she took no part of the conversation. As to whether or not Lt. May told me at the time that if I left the school I would forfeit my tuition and tried to get me to stay, on the contrary. He said that should I not accept the uniforms or textbooks from the school that tuition would be refunded with the exception of the $25.00 matriculation fee and the fee for the code book. As I understood his conversation, he said that a complete refund would be made minus the $25.00 and the matriculation fee and 35 cents. That conversation was with my father and in my presence, the three of us were in conversation, the three of us were there talking. The next day I went out there on what I called an official visit, which was to notify Lt. May that I definitely would not be a student that year, that I was not going to stay in school. As to what he said to that, he expressed regret that I was leaving but he said that, if I thought I would be better satisfied in my former working conditions, he understood my point of view, and he said that he would make the arrangements for the final refund. He said that he would make the arrangements for a financial refund. At that time he did not tell me what the arrangements were, he did not go into detail. I was not too interested in going to Riverside to begin with."

J. L. Beavers testified in part on cross examination: "I am superintendent for Riverside Military Academy and have been since 1947. I was superintendent in 1950, on September 16, 1950. Lt. May was employed by the Academy at that time. He was a member of the faculty, his duties were teaching history and athletic coach. His duties in the summer time were, he called

on prospective students in the states of Alabama, Mississippi and Louisiana. I know that he called on M. L. Rosenbaum. He was the representative of Riverside Military Academy at that time. He was authorized by Riverside to make representations as to the facilities of Riverside Military Academy. He was authorized to discuss courses, they were always approved by the registrar, under whose direction that comes. He was authorized to tell all the courses that Riverside offers. He is authorized to tell them all as to the installation, as to the facilities, such as furniture, rooms and general conduct of the school. He was at Riverside on the 16th of September 1950. On that day his duties were primarily, he was interested in getting the football team started because he was head football coach. He was also interested in getting new students registered. He lives on the campus in the dormitory. He has authority to accept applications of any new students for the school and submit them to the school for approval. He did that in the case of the Rosenbaum boy. I do not know how long the Rosenbaum boy stayed on the campus. I do not know what room he was assigned to."

The evidence authorized the jury to find that the son never became enrolled in or admitted to the school as a student, so as to prevent the plaintiff from recovering the tuition he had paid. The defendant relied almost wholly on the facts that the son had signed a registration or enrollment card, that he was issued a manual on "Cadet Regulations," and was assigned to a room. The card signed by the son was not in evidence but, assuming that it was a registration card and that the mere act of signing the card, if such signing were authorized, would constitute an enrollment or admittance within the meaning of the catalog—under the circumstances of this case the son would not have the authority to bind his father by such mere signing. When Lt. May had his conference with plaintiff and son in Meridian, the father signed an application blank which was as follows: "President Sandy Beaver, Gainesville, Georgia. Sir, I have read your catalogue and desire to secure a place for my son, named above, in Riverside Military Academy for the year beginning September 16, 1950, and ending June 4, 1951, in accordance with the terms set forth in that publication. I enclose herewith my check for Twenty-five ($25.00) dollars as part payment on the

School Bill. I will pay the balance ($1,269.00) in accordance with the plan checked below and outlined on the reverse of this application. . . If for any reason he should not enter Riverside this fall, it is understood and agreed that I forfeit the enclosed Twenty-five dollars, but am not otherwise responsible. Date 8-17-50 Signature /s/ M. L. Rosenbaum, 407 Lamar Building, Meridian, Mississippi."

The son testified that, after the conference in Meridian, he wired Lt. May that he did not desire to attend the school and would not enroll therein, and that in response thereto he received a telephone call from Lt. May urging him to come to Gainesville to see the school. The son also testified that, when he went to see the school, he was not sure he was going to enroll and attend. From both the plaintiff's and the son's testimony, the trip to Gainesville was for the purpose of seeing whether the son would like to attend and be enrolled. After the son's inspection of the school he decided that he would not like to enroll and notified his father to come and get him. The trip to Gainesville and inspection of the school were conditional and were in response to Lt. May's invitation. The school's agent testified on cross-examination that on the day the plaintiff and son visited the school one of Lt. May's duties was that of getting new students registered. Lt. May, upon being told that the son was dissatisfied with the school and would not like to attend, replied that, if the son was dissatisfied then and did remain dissatisfied upon staying, it would be better for the son not to stay because, if he remained, it would cost the father more than the $25 application fee. But if he decided not to stay, and to go back to Meridian with his father, the plaintiff would lose only $25 application or matriculation fee.

The plaintiff, and not the son, was the party to the agreement, and in view of the circumstances and the fact that the plaintiff was on the scene with his son and did not consent to his son's enrollment, and in view of the fact that the son had no authority to enroll without his father's consent or over his objection, the evidence produced demanded a finding for the plaintiff. No facts appear which would estop the plaintiff from recovering.

The court erred in awarding a nonsuit.

*Judgment reversed. Quillian and Nichols, JJ., concur.*